IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LANGLEY PORTER PSYCHIATRIC INSTITUTE,<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services,<br><br>Defendant. | No. C 09-2009 MEJ<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

Plaintiff Langley Porter Psychiatric Institute ("LP") filed a complaint against Defendant Kathleen Sebelius, Secretary of the United States Department of Health and Human Services (the "Secretary") seeking reversal of an adverse administrative decision. Before the court are both parties' cross-motions for summary judgment. (Def.'s Mot., Dkt. #26; Pl.'s Mot., Dkt. # 28.) Having read and considered the parties' papers, the administrative record below, and the relevant legal authority, the Court hereby DENIES LP's motion for summary judgment and GRANTS Defendant's motion for summary judgment for the reasons set forth below.

## II. FACTUAL BACKGROUND

**A.    The Medicare Program and Appeals Process**

The Medicare program was established in 1965 by Title XVIII of the Social Security Act. 42 U.S.C. § 1395 *et seq.* Medicare is a public health insurance program that furnishes health benefits to participating individuals once they reached the age of 65 as well as qualifying disabled

persons. *Id.* Under the Medicare program, an eligible Medicare beneficiary is entitled to have payment made by Medicare for covered medical services provided by a participating Medicare services provider. 42 U.S.C. § 1395ww(h).

Pursuant to the Medicare statute, administration of the Medicare program has been delegated to Centers for Medicare and Medicaid Services ("CMS"), which is a component of the Department of Health and Human Services ("DHHS"). 42 U.S.C. § 1395h. CMS then contracts with fiscal intermediaries, typically private insurance companies, to perform many of the Medicare audit and payment functions. 42 U.S.C. § 1395h. At the close of every fiscal year, a provider of services must submit to its intermediary a "cost report" showing its costs during the fiscal year and the appropriate share of these costs to be apportioned to Medicare. 42 C.F.R. § 413.24(f). The intermediary audits the cost report and makes a final determination of the amount of Medicare reimbursement through a notice of program reimbursement ("NPR"). 42 C.F.R. § 405.1803.

A hospital provider may contest the intermediary's determination of Medicare reimbursement through an administrative appeal to the Provider Reimbursement Review Board ("PRRB") if: 1) a hospital is dissatisfied with the intermediary's final determination; 2) the amount in controversy is at least $10,000; and 3) the hospital requests a hearing within 180 days of receiving the intermediary's determination. 42 U.S.C. § 1395oo(a); *see also* 42 C.F.R. § 405.1835. The CMS Administrator has discretion to review a PRRB decision. 42 U.S.C. § 1395oo(a). Upon review, the Administrator may reverse, affirm, or modify the decision. 42 U.S.C. § 1395oo(a). A Medicare provider has the right to obtain judicial review of any final decision of the PRRB, or any reversal, affirmance, or modification of the PRRB's decision by the CMS Administrator, by a civil action commenced within 60 days of the date on which notice of any final decision by the PRRB or CMS Administrator is received. 42 U.S.C. § 1395oo(a).

**B.     Medicare  DGME Reimbursement Scheme**

This case involves a controversy surrounding Medicare reimbursement for direct graduate medical education ("DGME") resident training costs. Medicare reimburses teaching hospitals for their share of costs associated with its DGME training program. 42 U.S.C. § 1395ww(h). Under

DGME payment methodology, a teaching hospital is paid a particularized amount for each full time equivalent resident ("FTE"), which is calculated from the hospital's average cost per resident using 1984 as the base year. 42 U.S.C. § 1395ww(h); 42 C.F.R. § 413.86.

Prior to 1997, the Medicare program imposed no limit on the number of FTEs that a hospital could report for purposes of DGME reimbursement. However, in the Balanced Budget Act of 1997 ("BBA 1997") Congress directed the Secretary to impose, with certain exceptions, a limit on direct DGME FTEs, known as an FTE cap. 42 U.S.C. § 1395ww(h)(4)(F)(I). Congress specified that a hospital's DGME FTE count cannot exceed its FTE count for the cost period ending on or before December 31, 1996. 42 U.S.C. § 1395ww(h)(4)(F)(I); *see also* 42 C.F.R. § 413.86(g)(4). The FTE cap took effect for cost reporting periods on or after October 1, 1997. *See* 62 Fed. Reg. 45966, 46004 (Aug. 29, 1997).

BBA 1997 also authorized the Secretary to prescribe rules that would allow institutions that are members of the same affiliated group, as defined by the Secretary, to apply the FTE cap on an aggregate basis. 42 U.S.C. § 1395ww(h)(4)(H)(ii). BBA 1997 permits but does not require the Secretary to prescribe rules directing institutions of the same affiliated group to apply the FTE cap on an aggregate basis. The statute provides in relevant part: "The Secretary may prescribe rules which allow institutions which are members of the same affiliated group (as defined by the Secretary) to elect to apply [their FTE caps] on an aggregate basis." 42 U.S.C. § 1395ww(h)(4)(H). Pursuant to the broad authority conferred by the statute, the Secretary issued controlling regulations in August 1997, which provide in relevant part:

> For purposes of determining direct graduate medical education payment, for cost reporting periods on or after October 1, 1997, a hospitals unweighted FTE count for residents in allopathic and osteopathic medicine may not exceed the hospital's unweighted FTE count for these residents for the most recent cost reporting period ending on or before December 31, 1996 . . . . Hospitals that are part of the same affiliated group may elect to apply the limit on an aggregate basis . . . .

42 C.F.R. § 413.86(g)(4). In a subsequent ruling, the Secretary provided additional guidance as to what is required of affiliated hospitals seeking to properly make an election to aggregate FTEs.

The Secretary provided the following guidance:

> In summary, we will apply the FTE caps for an affiliated group as follows:
>
> - Hospitals that qualify to be members of the same affiliated group for the current residency training year and elect an aggregate cap must provide an agreement to the fiscal intermediary and HCFA specifying the planned changes to individual hospital counts under an aggregate FTE cap by July 1 for the contemporaneous (or subsequent) residency training year
>
> . . .
>
> - Each agreement must specify that any positive adjustment for one hospital must be offset by a negative adjustment for the other hospital of at least the same amount.

63 Fed. Reg. at 26341 (May 12, 1998). The written affiliation agreement requirement was not codified in the DGME regulations until August 2002, when CMS amended its regulations. 67 Fed. Reg. 49,982, 50,069 (Aug. 1, 2002) (amending 42 C.F.R. §§ 413.86(b), 413.86(g)(7)).

**C.  Facts Specific to This Case**

LP and University of California San Francisco Medical Center ("UCSFMC") are adjacent health care facilities located in San Francisco, CA. (Administrative Record ("AR") 343; Def.'s Mot. 4:27-28, Dkt. #26.) Both serve as teaching hospitals for the University of California San Francisco. (AR 343; Def.'s Mot. 5:1.) LP is a not-for-profit hospital and part of the University of California, a public university that operates universities throughout the state of California. (AR 263; Pl.'s Compl. 3:9-10, Dkt. #1.) At all times relevant to this case, LP participated in an approved Medicare medical training program for physician interns, residents, and fellows. (AR 109; Pl.'s Compl. 3:11-12.)

From July 1993 until November 1, 1997, both hospitals operated under a single California license, with LP serving as sub-provider of UCSFMC for purposes of Medicare costs, including DGME reimbursement.[1] (AR 147; Pl.'s Mot. 5:9-20, Dkt. #28.) Since LP operated as a sub-provider unit of UCSFMC during the 1996 base year, the Intermediary assigned a single aggregated

---

[1] "Effective July 1, 1995, for Medicare cost reporting purposes, [LP] was treated as a distinct part psychiatric unit of UCSFMC and assigned a subprovider number." (Pl.'s Mot. 5:12-14; see also AR 141-48.)

FTE cap to UCSFMC, which incorporated both facilities.  (AR 141-43, 180, 185, 259-60, 300; Pl.'s Mot. 6:3-6.)  Pursuant to BBA 1997, the Intermediary capped UCSFMC's FTEs at 539.7, which included 505.87 residents that trained at UCSFMC and 33.5 residents that rotated to LP for training in FY 1996. (AR 175; Pl.'s Mot. 6:6-7.)  On November 1, 1997, LP separated from UCSFMC to facilitate UCSFMC's merger with Stanford University Medical Center.  (AR 233; Def.'s Mot. 5:12-13.)  As a result, LP applied for, and received, its own Medicare provider number as a free-standing psychiatric facility, which was effective on March 19, 1998.  (AR 111.)  Plaintiff was not assigned a separate FTE cap at that time.  (AR 111; Def.'s Mot. 5:13-15.)  After the 1997 split, the Intermediary continued to credit UCSFMC with the same FTE cap that had been established previously, which again included 33.5 FTEs that trained at LP in the 1996 base year. (AR 141-43, 180; Pl.'s Mot. 6:9-10.)  After the separation of the two hospitals, however, Plaintiff and UCSFMC continued to operate as before the separation; UCSF trained its psychiatric residents at LP and its other residents trained at UCSFMC.  (AR 141-43, 260; Pl.'s Mot. 6:10-13.)

On its as-filed cost reports, LP sought DGME reimbursements for the residents it trained for fiscal years ending June 30, 1999 and June 30, 2000 ("FYs 1999 and 2000"), up to the 33.5 FTE cap calculated from the 1996 base year.  (AR 100-04; Def.'s Mot. 5:24-26.)  The Intermediary denied LP's claim on the ground that the parties had not filed a written affiliation agreement to aggregate their FTEs for the time period in question.  (AR 100, 102, 104; Def.'s Mot. 26-28.)  LP appealed the Intermediary's DGME reimbursement audit adjustment to the PRRB.  (AR 1; Def.'s Mot. 6:1-3.)

**D.    PRRB Findings**

At a hearing held before the PRRB on June 12, 2007, LP argued that: 1) it met the definition of an affiliated group as defined at 42 C.F.R. § 413.86(b); and 2) the regulation in effect in FYs 1999 and 2000 did not require a written agreement to elect an affiliation.  The Secretary, acting through the PRRB, issued its decision on March 6, 2009, wherein it held that "[LP] failed to meet the requirements of the 42 C.F.R. §413.86(g)(4).  (AR 13.)  The single issue considered by the PRRB was "whether [LP's] right to claim affiliated group status [was] supported by an election."

Page 5 of  13

(AR 12.)  The PRRB found that "[LP] and UCSFMC failed to make the election in any form, thereby making the question moot whether specific requirements for a written agreement in the [regulatory] Preamble must be met." *Id.*  The PRRB found that: (1) LP and UCSFMC met the definition of an affiliated group as set forth in the Secretary's regulation at 42 C.F.R. § 413.86; and (2) LP trained residents and incurred the costs of that training during FYs 1999 and 2000.  (AR 7-13.)  However, a PRRB found that "the evidence is clear that there was never an election; that is, an agreement or understanding in any form between the parties to allocate FTEs." (AR 13.)  Because of the PRRB's decision, LP was not reimbursed its DGME training costs incurred during FYs 1999 and 2000.  (AR 7-13.)  The CMS Administrator declined to review the decision entered by the PRRB, which resulted in LP filing a complaint with this Court seeking judicial review and reversal of the PRRB's decision.  (AR 1; Pl.'s Compl. 2:19-22.)

### III.  PROCEDURAL BACKGROUND

On May 7, 2009, LP filed a Complaint under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 and the Administrative Procedure Act, 5 U.S.C. § 551, to obtain judicial review of a final agency decision regarding Medicare reimbursement payments rendered by the Secretary.  (Pl.'s Compl. 2:19-22, Dkt. #1.)  On October 30, 2009, LP and the Secretary filed cross-motions for summary judgment.  (Def.'s Mot., Dkt. #26; Pl.'s Mot., Dkt. # 28.)  On January 22, 2010, both parties filed oppositions.  (Dkt. # 31; Dkt. #32.)  On February 19, 2010 both parties filed replies.  (Dkt. #33; Dkt. #34.)  On May 6, 2010, the Court held a hearing on the matters.

### IV.  DISCUSSION

LP is seeking to reverse the PRRB's decision that LP failed to meet the regulatory requirements necessary to secure reimbursement for its DGME costs during FYs 1999 and 2000.  (Pl.'s Mot. 2:18-19.)  In its motion for summary judgment, LP asserts essentially two separate arguments: 1) the Secretary's decision is not based on substantial evidence; and 2) a written affiliation agreement is not required for LP to aggregate FTEs with UCSFMC.  But, since the PRRB found that LP failed to make an election "in any form," it rendered moot the question of whether the specific requirements in the preamble for a written agreement must be met.  (AR 13.)

Therefore, because the PRRB did not reach that issue, it is not properly before this Court. *Hospital of Univ. of Pennsylvania v. Sebelius*, 634 F. Supp. 2d 9, 12 (D.D.C. 2009) ("Axiomatically, a court cannot determine whether an agency decision is in accordance with the law or supported by substantial evidence if the agency did not decide anything."). Accordingly, the sole issue before the Court is whether the PRRB's decision that LP and UCSFMC failed to make an election to aggregate FTEs is supported by substantial evidence.

**A.    Legal Standard**

This Court has jurisdiction to review the Secretary's final decision, acting through the PRRB, pursuant to 42 U.S.C. § 1395oo(f), in accordance with the applicable provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.[2] When reviewing agency decisions, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985). Thus, summary judgment, serves as the appropriate mechanism for deciding the legal question of whether the Secretary's decision was reasonably grounded in the administrative record. *Id.*

In examining the Secretary's interpretation of the Medicare statute, the Court gives deference to the Secretary under *Chevron U.S.A. v. National Resources Defense Council*, 467 U.S. 837, 843-45 (1984). Under *Chevron*, unless Congress has spoken to the particular issue at hand, courts must defer to the agency's interpretation if it is a permissible construction of the statute. *Id.*; *French Hosp. Med. Ctr. v. Shalala*, 89 F.3d 1411, 1416 (9th Cir. 1996). Furthermore, the court takes note of the acute complexity of the Medicare statute, which adds to the deference due to the Secretary. Indeed, the Supreme Court has made clear that courts must give heightened deference to the Secretary's interpretation of a "complex and highly technical regulatory program" such as

---

[2] Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the submitted evidence demonstrates that "there is no genuine issue as to any issue of material fact and that the moving party is entitled to judgment as a matter of law. However, where the court is being asked to review a final agency decision under the APA, 5 § U.S.C. 706, the standard of review set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record. *Hospital of Univ. of Pennsylvania*, 634 F.Supp.2d at 12.

Medicare. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

The Secretary's decision must be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). Substantial evidence is something less than the weight of the evidence, but "more than mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* That two inconsistent conclusions could reasonably be drawn from the submitted evidence does not prevent the Secretary's decision from being supported by substantial evidence. *Consolo v. Fed. Maritime Comm.*, 383 U.S. 607, 620 (1966). The Secretary's decision is entitled to much deference, and "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Thomas Jefferson Univ.*, 512 U.S. at 512; *Independent Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir. 2000) (agency action is presumed valid and entitled to substantial deference).

**B.    The PRRB's Decision is Properly Based on UCSFMC's Failure to Adust its FTE Cap for FYs 1999 and 2000 to Reflect Corresponding Adjustments to LP's Own Reported FTE Cap for Those Years.**

LP argues that: (1) it was improper for the PRRB to base its decision solely on UCSFMC's failure to negatively adjust its FTE cap for FYs 1999 and 2000 in accordance with LP's FTE claim of 33.5 during that time; and (2) the PRRB's decision ignored evidence in the record showing that LP and UCSFMC had indeed elected to aggregate FTE caps for fiscal years 1999 and 2000.[3] (Pl.'s Mot. 11:2-6.) In response, the Secretary argues that the PRRB "carefully considered all evidence in the record and could properly find dispositive the fact that [UCSFMC] reported its entire FTE resident cap on its cost reports for the cost years at issue to be inconsistent with an intent to

---

[3] Although there was a negative adjustment to UCSFMC's FTE cap during FYs 1999 and 2000, the submitted evidence demonstrates that the adjustment did not, and was not intended to, correspond with any positive adjustment in LP's FTE cap. (AR 25.) Additionally, the record shows that LP actually claimed DGME reimbursement for FTEs trained at LP in its cost reports for 1999 and 2000. (AR 101, 262, 352-53.) LP's DGME reimbursement claim was based on an FTE cap of 33.5, which is the same FTE cap that was in effect when it operated as a sub-provider to UCSFMC. (AR 101, 262.)

1  aggregate any portion of its FTE cap to [LP]."  (Def.'s Opp'n. Mot. 17:24-27.)

2         The express language of the controlling regulation provides that "[h]ospitals that are part of

3  the same affiliated group may elect to apply the limit on an aggregate basis."  42 C.F.R. §

4  413.86(g)(4).  Not surprisingly, given the inherent complexity of the controlling regulations, the

5  Secretary provided further interpretive guidance in the preamble to the May 12, 1998 Federal

6  Register Notice, wherein the Secretary described in detail what is required of affiliated hospitals

7  seeking to make an election to apply their FTE caps on an aggregate basis:

> In summary, we will apply the FTE caps for an affiliated group as follows: Hospitals that qualify to be members of the same affiliated group for the current residency training year and elect an aggregate cap must provide an agreement to the fiscal intermediary and HCFA specifying the planned changes to individual hospital counts under an aggregate FTE cap by July 1 for the contemporaneous (or subsequent) residency training year . . . . *Each agreement must specify that any positive adjustment for one hospital must be offset by a negative adjustment for the other hospital of at least the same amount.*

14  63 Fed. Reg. at 26341 (May 12, 1998) (emphasis added).

15         After searching the record for evidence of an election, the PRRB found that LP and

16  UCSFMC met the requirements to be an affiliated group, but failed to make an election to

17  aggregate FTEs because UCSFMC's FTE cap for FYs 1999 and 2000 was not reduced to reflect

18  LP's reported FTE cap for those years.  (AR 13, 27.)  In fact, there was a negative adjustment to

19  UCSFMC's FTE cap during FYs 1999 and 2000, but the submitted evidence demonstrates that the

20  adjustment did not, and was not intended to, correspond with any positive adjustment in LP's FTE

21  cap.  (AR 25.)  Consistent with the regulatory guidance, the PRRB characterized this reporting

22  discrepancy as a "fail[ure] to meet the requirements of the regulation that would have secured

23  reimbursement for these costs."  (AR 13.)

24         Given the express guidance contained in the regulatory preamble, which provides a detailed

25  explanation of the regulatory requirements, including a requirement that each affiliation agreement

26  "must specify that any positive adjustment for one hospital must be offset by a negative adjustment

27  for the other hospital of at least the same amount," this Court finds that UCSFMC's failure to satisfy

1 this requirement is such relevant evidence as a reasonable mind might accept as adequate to support
2 the PRRB's conclusion.  63 Fed. Reg. at 26341.[4]

3       LP argues that it was improper for the PRRB to rely solely on this cost reporting
4 discrepancy, claiming that it is irrelevant to the hospitals' intention to aggregate FTEs because
5 UCSFMC did not have discretion to adjust its FTE cap that was assigned by the fiscal intermediary
6 in accordance with BBA 1997.  (Pl.'s Mot. 12:21-27.)  Nevertheless, the PRRB's decision to focus
7 on UCSFMC's failure to adjust its FTE cap for FYs 1999 and 2000 is reasonable and consistent
8 with the interpretive guidance contained in the preamble to the 1998 Final Rule.  In reviewing
9 agency decisions, the Court's "task is not to decide which among several competing interpretations
10 best serves the regulatory purpose."  *Thomas Jefferson Univ.*, 512 U.S. at 512.  The Court's role
11 here is simply to determine if the PRRB's decision is based on a permissible interpretation of the
12 controlling regulations and reasonably grounded in the administrative record.  *Id.*  Consistent with
13 that role, the Court finds that the PRRB's decision that LP and UCSFMC failed to make an election
14 to aggregate FTEs was neither plainly erroneous nor inconsistent with the regulation.

### C. Whether the PRRB's Decision is Supported by Substantial Evidence, Despite Evidence That Detracts From the PRRB's Findings.

17       LP argues that the PRRB's decision ignores evidence in the record, which it claims
18 demonstrates that LP and UCSFMC had indeed made an election to aggregate their FTE caps
19 during FYs 1999 and 2000.  (Pl.'s Mot. 12:16-18.)  Specifically, LP points to the declaration of
20 UCSFMC Director of Reimbursement Services, Ms. Charlotte Canari, and to the testimony of LP's
21 Chief Financial Officer, Ms. Diane Schlueter.  (Pl.'s Opp'n. Mot. 5:25.)  LP also points to specific
22 instances in the record of the hospitals' own conduct, which it claims demonstrate that each was
23 operating under the belief that an election to aggregate FTEs had been made.  *Id.*  Finally, LP points

---

[4] Although the regulatory preamble does not carry the same force as a fully noticed statute or regulation, "agencies normally address problems in a detailed manner and can speak through a variety of means, including regulations, preambles, interpretive statements, and responses to comments." *Hillsborough v. Automated Medical Laboratories*, 471 U.S. 707, 718 (1985).

to specific instances in the record of the conduct of CMS and the fiscal intermediary, which it claims provide even more justification for the hospitals' belief that an election to aggregate FTEs had been made. *Id.* at 6:1-4.

LP relies heavily on the declaration of UCSFMC Director of Reimbursement Services, Charlotte Canari, claiming that it demonstrates that UCSFMC operated on the belief that an agreement to aggregate FTEs existed during FYs 1999 and 2000. In particular, LP points to the portions of this declaration that describe UCSFMC's administrative and operational posture towards LP with respect to the FTE resident exchange program after the 1997 split.[5] (Pl.'s Opp'n. Mot. 6:5-16.) Although Ms. Canari's declaration fails to use the term "election" to describe the agreement between UCSFMC and LP, LP maintains that it still demonstrates that UCSFMC actually believed that an election to aggregate FTEs existed in practice throughout FYs 1999 and 2000. Further, LP claims that Ms. Canari's statements are probative of the hospital's belief that their prior agreement to aggregate FTEs would be unaffected by the change in ownership.

LP also points to the testimony of LP Chief Financial Officer, Diane Schlueter. Ms. Schlueter's testimony explains, in relevant part, that UCSFMC and LP had always shared residents, with LP training UCSF's psychiatric residents and UCSFMC training non-psychiatric residents. (Pl.'s Opp'n. Mot. 6:19-21; AR 262.) LP maintains that Ms. Schlueter's testimony provides additional indirect evidence of LP's understanding that it had elected to aggregate FTEs during fiscal years 1999 and 2000. *Id.*

LP maintains that there is ample evidence in the record showing that LP and UCSFMC both believed at the time that they had successfully elected to aggregate FTEs during FYs 1999 and 2000. Specifically, LP argues that the record shows there was no significant administrative or operational change in the resident exchange program between LP and UCSFMC after the split in

---

[5] Ms. Canari's declaration states in pertinent part that: 1) "UCSFMC has always understood and agreed that its psychiatric residents would be trained at LP"; and 2) "[the] formal separation between the two facilities[,]" which took place on November 1, 1997, "did not change the arrangement for training UCSF residents." (AR 142.)

1997.[6] LP contends that the actions of both hospitals are consistent with the existence of an implicit election to aggregate FTEs during fiscal years 1999 and 2000. (Pl.'s Opp'n. Mot. 5-6:25-1.)

LP also points to the written affiliation agreement between LP and UCSFMC filed on June 28, 2001. (Pl.'s Opp'n. Mot. 7:10-13; AR 177-78.) The record shows that LP prepared and filed this written affiliation agreement just one day after it first became aware on June 27, 2001, that CMS would be requiring a written affiliation agreement with UCSFMC for LP to receive DGME payment for the residents it trained. (AR 177-78.) LP maintains that the expediency with which this agreement was executed demonstrates the two hospitals' belief that the written agreement was merely a continuation of an already existing implied agreement. (Pl.'s Opp'n. Mot. 7:10-13.)

Finally, LP points to evidence in the record, which it claims demonstrates that for most of the history of this dispute, both CMS and the Intermediary understood that LP and UCSFMC had elected to aggregate FTEs. LP points to a letter from CMS Administrator Thomas Scully responding to a letter from LP's U.S. House representative, Nanci Pelosi.[7] (Pl.'s Opp'n. Mot. 7-8:23-5; AR 122.) Mr. Scully stated that he had conferred with other CMS officials and concluded that "[i]f UCSFMC and LP can demonstrate that they met the requirements to be treated as an affiliated group . . . [CMS] would allow LP to count all the time the residents spent training at LP for purposes of receiving GME reimbursement for that time period." (AR 122.)

Under the applicable legal standard, the PRRB's decision need only be supported by substantial evidence. As previously discussed, substantial evidence is something less than the

---

[6]The record indicates that UCSFMC continued to share related documentation, information, and FTE residents with LP after the 1997 split, just as it had prior. In particular, the record shows that on August 3, 1999, UCSFMC provided LP with supporting documentation for the 33.5 FTEs trained by LP in 1996. (AR 180, 262.)

[7]On November 13, 2001, the congressional representative for both LP and UCSFMC, Speaker Nancy Pelosi, wrote to the Secretary of DHHS, Tommy Thompson and CMS Administrator Thomas Scully, on behalf of LP, to request that LP and UCSFMC be permitted to aggregate FTEs from July 1, 1998 through June 30, 2001. (AR 117.) In her letter, Ms. Pelosi referred to the July 1, 2001 written affiliation agreement as "demonstrat[ing] that UCSFMC intended to release 33.5 FTEs to LP for the earlier periods but missed Medicare's administrative requirement" to file written affiliation agreements for those periods. (AR 117.)

**United States District Court**
For the Northern District of California

weight of the evidence, but "more than mere scintilla." *Richardson*, 402 U.S. at 401. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id. (*internal citations omitted*).* That two inconsistent conclusions could reasonably be drawn from the submitted evidence does not prevent the Secretary's decision from being supported by substantial evidence. *Consolo*, 383 U.S. at 620. In applying the substantial evidence standard, this Court is not entitled to "displace the . . . [PRRB's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).   Simply because evidence exists in the record that detracts from the PRRB's decision does not keep it from being supported by substantial evidence. *Vallejo Gen. Hosp. v. Bowen*, 851 F.2d at 233. This court must affirm the PRRB's decision if it is supported by "such evidence as a reasonable mind might accept as adequate . . . even if it is possible to draw two inconsistent conclusions from the evidence." *Id.* Therefore, because the Court has determined that the PRRB's reliance on UCSFMC's failure to adjust its FTE cap to reflect corresponding adjustments to LP's FTE cap was neither plainly erroneous nor inconsistent with the regulation, the Court is compelled to find the PRRB's decision is supported by substantial evidence, notwithstanding the existence of evidence in the record that detracts from the evidence relied upon by the PRRB.

## VI. CONCLUSION

Based on the analysis above, the Court DENIES LP's motion for summary judgment and GRANTS the Secretary's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: August 3, 2010

MARIA-ELENA JAMES
United States Magistrate Judge